**Dr. Neville GIBBS, Plaintiff,**

v.

**AMERICAN AIRLINES, INC., Defendant.**

**No. CIV.A. 99–03267HHK.**

United States District Court, District of Columbia.

March 8, 2002.

Donald Melvin Temple, Washington, DC, for Plaintiff.

Ronald Greer DeWald, Michael Tilmon O'Bryant, Lipshultz & Hone, Chartered, Silver Spring, MD, for Defendant.

**MEMORANDUM OPINION**

KENNEDY, District Judge.

Plaintiff, Dr. Neville Gibbs ("Dr.Gibbs"), brings this action under 42 U.S.C. § 1981 ("Section 1981") alleging that defendant, American Airlines Corporation ("American Airlines") discriminated against him based upon his race by removing him from a flight after he had a verbal altercation with a flight attendant. Before the court is American Airlines' motion for summary judgment. American Airlines contends that Dr. Gibbs' claim is barred under the Warsaw Convention [1] because the alleged

---

1. The Warsaw Convention is officially known as Convention for the Unification of Certain Rules Relating to International Transporta-tion by Air, Oct. 1, 1929, 49 Stat. 3000 (1934), reprinted in note following 49 U.S.C. § 40105 (1997) [hereinafter Warsaw Convention].

discrimination took place during an international flight, and in the alternative that Dr. Gibbs has failed to make out a prima facie case under Section 1981. Because the Warsaw Convention preempts Dr. Gibbs' Section 1981 claim and he cannot recover under the Convention itself, the motion of American Airlines must be granted.

## I. FACTUAL BACKGROUND

This action arises from events that transpired before takeoff on an American Airlines flight from Miami to Trinidad in February, 1999. The following account of those events is set forth in the light most favorable to Dr. Gibbs.

On February 6, 1999, Dr. Gibbs, an African American, and two companions, Pierre Cumbo ("Cumbo") and Dr. Lennox E. Joseph ("Dr. Joseph"), also African Americans, traveled from Reagan National Airport in Washington, D.C. to Miami International Airport on an American Airlines flight. In Miami they transferred to American Airlines flight # 1819 to Picaro, Trinidad. After boarding flight # 1819, Dr. Gibbs and his companions took their seats. Dr. Gibbs sat in the row directly in front of Cumbo and Dr. Joseph.

After the plane then taxied onto the runway and was in a holding pattern, an announcement was made that landing immigration cards would be distributed while the plane was awaiting takeoff. A flight attendant, later identified as Jerri Bell ("Bell"), came down the aisle distributing the cards. Dr. Gibbs and his companions noticed that Bell seemed upset and angry. When Dr. Joseph greeted Bell and asked her how things were going, Bell replied that it had been a "rough day." She then leaned over to Dr. Joseph and commented in an allegedly "derogatory" tone of voice that the "black people" on the plane were misbehaving, and that her white colleagues

were asking her why the "black people" were behaving that way. Bell also stated that the behavior of the "black people" on the plane was embarrassing to her as a black person.[2]

Dr. Gibbs, seated in the row in front of Cumbo and Dr. Joseph, could not hear what Bell said but observed her speaking with his companions and leaned back to ask what they were discussing. In response, Bell allegedly became "very confrontational" and snapped, "That's exactly what I'm talking about!" She then approached Dr. Gibbs, leaned in close to his face, and shook her finger at him while loudly repeating, "That is none of your business." Dr. Gibbs told Bell she was being rude, to which she allegedly responded in a heated voice, "I could put you off this plane!"

Bell then departed and returned a few minutes later with James Morello ("Morello"), the aircraft's purser. Morello handed Dr. Gibbs an official warning card containing language based upon 14 C.F.R. § 91.11 (stating that "[n]o person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated"). Dr. Gibbs refused to accept the warning and requested that Morello question surrounding passengers to verify what had transpired between him and Bell. Dr. Gibbs alleges that two passengers verified his version of events, but were ignored by Morello, and that other passengers protested the way he was being treated by Morello and Bell.

Morello and Bell departed, and a few minutes later the plane returned to the gate. A man dressed in a uniform and two police officers from the Dade County Police Department then came down the aisle toward Dr. Gibbs. According to a police

---

**2.** Bell is of Caribbean descent.

report, Bell had told them that Dr. Gibbs was an "unruly passenger" who had been involved in a "verbal altercation" with her. The officers told Dr. Gibbs that the Captain had ordered his removal from the plane.[3] Dr. Gibbs complied. Thereafter he was escorted by the police into the terminal. He was accompanied by his two companions, who decided to leave the plane with him.[4]

Dr. Gibbs was detained by the police in the terminal and questioned about his conduct on the plane. After Dr. Gibbs explained his version of the incident, the police decided that no criminal activity had occurred and released him. American Airlines facilitated his accommodations in Miami that night and his flight to Trinidad the next day. Upon arriving in Trinidad, Dr. Gibbs learned that many persons traveling there had heard about the events on flight # 1819.

Dr. Gibbs claims that he did not scream at Bell or use any language that could be deemed to threaten or harass her. He alleges that as a result of the actions taken by American Airlines personnel he has suffered "significant public embarrassment and humiliation, loss of self esteem, mental anguish and severe emotional trauma resulting in periods of sleeplessness, headaches, frequent gastrointestinal discomfort and loss of appetite."

In his complaint, Dr. Gibbs alleged common law tort and contract claims, as well as statutory discrimination claims under Section 1981 and the Federal Aviation Act, 49 U.S.C. § 41310 ("Section 41310"). Dr. Gibbs subsequently conceded that his common law claims were preempted by the Warsaw Convention and that Section 41310 does not provide a private cause of

action, leaving only his Section 1981 claim in dispute.

## II. ANALYSIS

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law. Facts "that might affect the outcome of the suit under the governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-movant's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant's evidence must be of a nature "that would permit a reasonable jury to find" in its favor. *Laningham v. Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). Evidence that is "merely colorable" or "not significantly probative," is not sufficient to sustain a grant of summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. Preemption Under Warsaw Convention

In his remaining claim, Dr. Gibbs contends that American Airlines violated Section 1981 because it refused to perform its contract to transport him on flight # 1819

---

3. Morello apparently reported the presence of an "unruly" passenger to the Captain. The Captain never spoke to Dr. Gibbs personally, but ordered him off the plane because he felt "he had to back his crew."

4. Neither Cumbo nor Dr. Joseph were ordered off the plane, but instead chose to accompany Dr. Gibbs voluntarily. They are not parties to this action.

on the basis of his race.[5] American Airlines argues that Dr. Gibbs is precluded from recovering for this claim as a matter of law because the Warsaw Convention (the "Convention") preempts Section 1981 claims and Dr. Gibbs cannot recover under the Convention itself. Dr. Gibbs concedes that he cannot recover under the Convention, but argues that the preemptive effect of the Convention does not extend to discrimination claims.

Before analyzing these arguments, it is helpful to describe the basic structure of the Convention. The Convention is a comprehensive international treaty governing air carrier liability for "all international transportation of persons, baggage, or goods." 49 U.S.C. § 40105 *et seq.* Article 17, the provision governing liability for personal injury to passengers, establishes that air carriers "shall be liable" for death or other "bodily injury" to a passenger caused by an "accident" that took place "on board the aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3018. Article 19 provides that air carriers "shall be liable" for damage caused by "delay in the transportation by air of passengers, baggage, or goods." *Id.* at 3019. At the time this action was filed, Article 24, the provision delineating the preemptive effect of the Convention, mandated that in cases covered by Articles 17 and 19, "any action for damages, *however founded,* can *only* be brought subject to the conditions and limits set out in this convention." *Id.* at 3020 (emphases added). Those limits include a cap on damages of $75,000 per passenger. See id.[6]

In *El Al Airlines, Ltd. v. Tseng,* 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999), the leading Supreme Court decision on the preemptive scope of the Convention, the Court held that recovery for "personal injury claims" arising during international air travel "if not allowed under the Convention, is not available at all." *Id.* at 161, 119 S.Ct. 662. The plaintiff in *Tseng* alleged that she suffered psychic and psychosomatic injuries due to an invasive security search prior to boarding an international flight. *Id.* at 160, 119 S.Ct. 662. Because her injuries did not constitute "bodily injury" and did not result from an "accident" as required under Article 17, the plaintiff acknowledged that she could not recover under the Convention and instead sought to recover under New York tort law. The Court found that her state tort claims were preempted under the Convention, even though the Convention barred her from recovery, and she was thus left without a cause of action.

*Tseng* did not involve a federal statutory or civil rights claim, and neither the Supreme Court nor the federal appeals courts have explicitly considered such claims in light of the Convention. However, American Airlines argues based upon the decisions of three federal district courts that Convention should preempt statutory discrimination claims as well as common law claims. *See Turturro v. Continental Airlines,* 128 F.Supp.2d 170 (S.D.N.Y.2001) (holding that plaintiff's discrimination claim under the federal Air Carrier Access Act ("ACAA") was preempted under the Convention); *King v. American Airlines, Inc.,* 146 F.Supp.2d

---

**5.** Section 1981 provides that "all persons . . . shall have the same right . . . to make and enforce contracts." The statute defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of

the contractual relationship." 42 U.S.C. § 1981(b).

**6.** Article 24 has since been amended by Montreal Protocol No. 4, which became effective March 4, 1999.

159 (N.D.N.Y.2001) (holding that plaintiffs' discrimination claim under Section 1981 was preempted under the Convention); *Brandt v. American Airlines*, 2000 WL 288393 (N.D.Cal.2000) (holding that plaintiffs' discrimination claim under the ACAA was preempted by the Convention). Dr. Gibbs, while conceding that he did not suffer the "bodily injury" required to recover under the Convention, argues that *Tseng* governs only common law personal injury claims and that Congress did not intend the Convention to impede civil rights claims rooted in the Constitution, such as Section 1981 claims. Dr. Gibbs' argument cannot be sustained.

Although the Supreme Court had only state tort claims before it in *Tseng*, the Court rested its holding not on the nature of the claims being brought, but on the importance of uniformity in the treaty's liability scheme. "The cardinal purpose of the Warsaw Convention . . . is to 'achiev[e] uniformity of rules governing claims arising from international air transportation.'" *Id.* at 169, 119 S.Ct. 662 (quoting *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 552, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991)). Uniformity was sought by the treaty signatories as a means to balance the need to expand international air service and the need to compensate injured passengers. *See id.* at 170, 119 S.Ct. 662. As the Court explained in *Tseng*, "Before [the Convention], injured passengers could file suits for damages, subject only to the limitations of the forum's laws . . . This exposure inhibited the growth of the then-fledgling international airline industry." *Id.* Given this background and the Convention's "textual emphasis on uniformity," the Court found itself "hard put to conclude that the delegates at Warsaw meant to subject air carriers to the distinct, nonuniform liability rules of the individual signatory nations." *Id.*

Because federal discrimination statutes such as Section 1981 are part of the "distinct liability rules" of the United States as an individual signatory, American Airlines argues that the need for uniformity dictates that claims based on these statutes are also preempted under the Convention. We agree. The negative consequences that the *Tseng* Court found would flow from "[c]onstruing the Convention . . . to allow passengers to pursue claims under local law when the Convention does not permit recovery" are no less likely with statutory discrimination claims than with common law claims. *Id.* at 171, 119 S.Ct. 662. As with the plaintiff's common law claim in *Tseng*, if Dr. Gibbs' Section 1981 claim is not preempted, air carriers would be "exposed to unlimited liability under diverse legal regimes, but would be prevented, under the treaty, from contracting out of such liability." *Id.* Such a reading, the Court found, would undermine "the predictability that adherence to the treaty has achieved worldwide." *Id.See also Brandt*, 2000 WL 288393 at *4 (finding, following *Tseng*, that "[a]llowing air carrier exposure to discrimination claims which do not conform to the requirements of the Convention would undercut the signatory nations' desire for uniformity"); *Turturro*, 128 F.Supp.2d at 180.

The emphasis on the need for uniformity in *Tseng* is not the only indication that the Court's ruling in that case should govern this one. The *Tseng* Court repeatedly contrasts "local law" with the Convention to denote that the former is preempted by the latter. *See, e.g., Tseng*, 525 U.S. at 172, 119 S.Ct. 662 (noting that construing the Convention to "allow passengers to pursue claims under *local law* when *the Convention* does not permit recovery could produce several anomalies") (emphases added). This language is meant to distinguish the national laws of individual signatories (not the laws of individual states of

the United States) from international law. Federal discrimination statutes clearly fall into the former category. *See Turturro,* 128 F.Supp.2d at 180 (finding following *Tseng* that " 'local' law certainly includes federal statutes such as plaintiff's discrimination claim under the [ACAA]").

Moreover, decisions by the courts of other signatories cited by the *Tseng* Court as "corroborat[ing]" its "understanding of the Convention's preemptive effect," *Tseng,* 525 U.S. at 176 & n. 16, 119 S.Ct. 662, clearly envision that all claims under national law, whether common law or statutory, will be preempted by the Convention. For example, the *Tseng* Court cites language from the British House of Lord's decision in *Sidhu v. British Airways plc* [1997] 1 All E.R. 193, 201, stating that "in all questions relating to the carrier's liability, it is the provisions of the [C]onvention which apply and ... the passenger does not have access to any other remedies, *whether under the common law or otherwise,* which may be available within the particular country where he chooses to raise his action." (emphasis added) (quoted in *Tseng,* 525 U.S. at 175, 119 S.Ct. 662). *See also Naval–Torres v. Northwest Airlines, Inc.,* 159 D.L.R. (4th) 67, 73, 77 (1998) (Sharpe, J.) (holding by a judge of the Ontario Court (General Division) rejecting passenger's contention that she was "entitled in law to pursue any common law *or statutory* claims which exist apart from any claims she may have under the Convention") (emphasis added) (quoted in *Tseng,* 525 U.S. at 175, n. 16, 119 S.Ct. 662).

Dr. Gibbs argues nonetheless that because *Tseng* involved a personal injury claim and not a discrimination claim, it is inapplicable to the present case. The court acknowledges that these two types of claims are not equivalent in degree or in kind. The former is based upon common law while the latter is based upon federal statute, and federal civil rights statutes in particular have been deemed of great public importance in this country. *See Brandt,* 2000 WL 288393 at \*4 (noting these differences). However, the rationale for the Court's decision in *Tseng*—that the primary purpose of the Convention is to prevent variations in liability according to local law—does not distinguish between types of local law, only between local and international law. *See Brandt,* 2000 WL 288393 at \*4 (finding following *Tseng* that differences between statutory discrimination and common law claims are not cognizable for purposes of preemption under Convention). This does not mean that discrimination always goes unpunished under the Convention, however; where discrimination constitutes an "accident"—which both parties concede it did here—and causes "bodily injury," recovery may be had under Article 17. The fact that recovery for discrimination that does not meet these two criteria may be foreclosed "should not surprise anyone," given that the Convention also "massively curtails damage awards for victims of horrible acts such as terrorism." *Turturro,* 128 F.Supp.2d at 181.

## III. CONCLUSION

Because the court finds that discrimination statutes are "local laws" preempted under the Convention in order to achieve uniformity in liability amongst Convention signatories, and because Dr. Gibbs concedes that he cannot recover under the Convention itself, the motion of American Airlines must be granted. An appropriate order accompanies this memorandum opinion.

## ORDER

For the reasons stated in the court's memorandum opinion docketed this same

**150**

day, it is this 8th day of March, 2002, hereby

**ORDERED** that the complaint is **DISMISSED**.